T.C. Memo. 1996-105


UNITED STATES TAX COURT


HOSPITAL CORPORATION OF AMERICA AND SUBSIDIARIES,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10663-91, 13074-91,        Filed March 7, 1996
            28588-91,  6351-92.


<u>N. Jerold Cohen</u>, <u>Randolph W. Thrower</u>, <u>J.D. Fleming, Jr.</u>,

<u>Walter H. Wingfield</u>, <u>Stephen F. Gertzman</u>, <u>Reginald J. Clark</u>,

<u>Amanda B. Scott</u>, <u>Walter T. Henderson, Jr.</u>, <u>William H. Bradley</u>,

and <u>John W. Bonds, Jr.</u>, for petitioners in docket No. 10663-91.

    <u>N. Jerold Cohen</u>, <u>Randolph W. Thrower</u>, <u>J.D. Fleming, Jr.</u>,

<u>Walter H. Wingfield</u>, <u>Stephen F. Gertzman</u>, <u>Reginald J. Clark</u>,

---

[1]

    These cases were consolidated for purposes of trial,
briefing, and opinion, and will hereinafter be referred to as the
instant case.

Amanda B. Scott, Walter T. Henderson, Jr., William H. Bradley, John W. Bonds, Jr., and Daniel R. McKeithen, for petitioners in docket No. 13074-91.

N. Jerold Cohen, Walter H. Wingfield, Stephen F. Gertzman, Amanda B. Scott, Reginald J. Clark, Randolph W. Thrower, Walter T. Henderson, Jr., and John W. Bonds, Jr., for petitioners in docket No. 28588-91.

N. Jerold Cohen, Reginald J. Clark, Randolph W. Thrower, Walter T. Henderson, and John W. Bonds, Jr., for petitioners in docket No. 6351-92.

Robert J. Shilliday, Vallie C. Brooks, and William B. McCarthy, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Judge: Respondent determined deficiencies in petitioners' consolidated corporate Federal income taxes as follows:

| Year | Deficiency |
|------|------------|
| 1978 | $2,187,079.00 |
| 1980 | 388,006.58 |
| 1981 | 94,605,958.92 |
| 1982 | 29,691,505.11 |
| 1983 | 43,738,703.50 |
| 1984 | 53,831,713.90 |
| 1985 | 85,613,533.00 |
| 1986 | 69,331,412.00 |
| 1987 | 294,571,908.00 |
| 1988 | 25,317,840.00 |

Respondent also determined that petitioners are liable for increased interest under section 6621(c)[2] for each year in issue. The issue we decide in the instant opinion[3] is whether respondent's determination changing certain petitioners from a hybrid method of accounting to an overall accrual method of accounting for the taxable years ended 1981 through 1986 was an abuse of respondent's discretion.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The stipulated facts are incorporated herein by reference and are found accordingly.

During the years in issue, petitioners were members of an affiliated group of corporations whose common parent was Hospital

---

[2]

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]

The instant case involves several issues, some of which have been settled. The issues remaining for decision involve matters falling into four reasonably distinct categories, which the parties have denominated as the tax accounting issues, the MACRS depreciation issue, the HealthTrust issue, and the captive insurance or Parthenon Insurance Co. issues. Issues involved in the first three categories were presented at a special trial session, and the captive insurance issues were severed for trial purposes and were presented at a subsequent special trial session. Separate briefs of the parties were filed for each of the distinct categories of issues. The instant opinion involves one of the tax accounting issues. The other issues remaining for decision will be addressed in one or more separate opinions subsequently to be released.

Corporation of America (HCA).  HCA maintained its principal offices in Nashville, Tennessee, on the date the petitions were filed.  For each of the years involved in the instant case, HCA and its domestic subsidiaries filed a consolidated U.S. Corporation Income Tax Return on Form 1120 with the Director of the Internal Revenue Service Center at Memphis, Tennessee.

General Background

In 1960, Park View Hospital, Inc., was incorporated under the laws of the State of Tennessee.  During 1968, Park View Hospital, Inc., joined with 11 other hospitals to form HCA, and thereafter until 1989, HCA stock was publicly held and traded on the New York Stock Exchange.[4]

Petitioners' primary business is the ownership, operation, and management of hospitals.  As of January 1, 1981, petitioners owned and operated 101 hospitals.  By the end of 1986, petitioners owned and operated 243 hospitals through 134 corporations.

HCA and its subsidiaries were formed as for-profit corporations, based on the theory that operating health care

---

[4]

During 1989, HCA became a privately held corporation and remained so until 1992, when it again went public and changed its name to HCA-Hospital Corp. of America.  On Feb. 10, 1994, the corporation was merged with and into Galen Healthcare, Inc., a subsidiary of Columbia Healthcare Corp. of Louisville, Kentucky, and such subsidiary changed its name to HCA-Hospital Corp. of America.  On that same date, the parent changed its name to Columbia/HCA Healthcare Corporation.

facilities as a group promotes greater efficiency and provides economies of scale and thereby generates a profit. HCA was one of the first public corporations to operate hospitals as a for-profit business.

Most of petitioners' hospitals are acute care hospitals providing a facility, personnel, equipment, and medical supplies and pharmaceuticals[5] needed to perform medical and surgical procedures to treat injured or sick persons with various physical disorders. Some of petitioners' facilities are psychiatric hospitals providing medical treatment to persons with mental or emotional disorders and drug and alcohol dependency problems. Certain petitioners operate a variety of medically related businesses ancillary to the hospitals, including laundries, office buildings, home health care facilities, ambulance companies, and laboratories.[6]

Description of Petitioners' Hospitals

All of petitioners' hospitals maintain and operate patient floors on which patient rooms are situated. They also maintain and operate kitchens which are used to prepare food for patients and for the hospital cafeterias.

_____

[5]

Hereinafter, we sometimes will use the term "medical supply" to refer to a medical supply or pharmaceutical.

[6]

The parties have stipulated that our holding relating to the change in method of accounting adjustments for petitioners' hospitals shall also apply to the change in method of accounting adjustments proposed for petitioners' medically related non-hospital businesses.

Acute Care Hospitals

Petitioners' acute care hospitals provide to the physicians on their staff and their patients the facilities, equipment, medical supplies, and nursing and other personnel necessary for the diagnosis and treatment of physical conditions that cannot be performed at the physicians' own offices. The physicians on the medical staff of petitioners' hospitals generally are not employees of the hospital and usually operate medical practices independent of the hospitals. They join the staff of the hospital in order to gain access to the hospitals' facilities for use by them and their patients.

A wide range of medical procedures is performed in petitioners' hospitals, such as diagnostic and surgical procedures (inpatient and outpatient), emergency treatment, child delivery, neonatal care, and intensive care treatment. Most of those procedures require the use of medical supplies.

Petitioners' hospitals employ administrative personnel, nurses, patient attendants, laboratory technicians, physical therapists, and other medical personnel to provide medical treatment to patients under the direction and supervision of the patient's attending physician. All registered nursing positions and many other positions require special professional or technical training and/or certification.

When admitted to one of petitioners' hospitals, a patient is required to sign various releases, insurance assignments, and

patient agreements.  The hospital generally requires each patient to agree to pay for all charges incurred while in the hospital upon demand by the hospital.  Medicare,[7] Blue Cross, health maintenance organization (HMO), and some other insurance plan patients, however, are responsible only for a copayment.[8]

For acute care hospital patients, the nurses and patient attendants perform a wide variety of services, including, but not limited to, assisting physicians during patient examinations and medical procedures and treatments, administering medications, preparing and operating specialized equipment used in treating patients, monitoring patients' conditions, serving meals to patients and regulating and monitoring their food intake, assisting in bathing patients, and helping them into and out of bed.  Nurses and other hospital personnel also are involved in surgical procedures performed at a hospital.  If an acute care hospital maintains a delivery room and obstetric care and newborn care units, delivery room nurses and other staff employees assist the physician in the delivery of newborn infants, provide daily

---

[7]

During the years involved, petitioners received reimbursements from Medicare equal to 35 percent to 43 percent of the total operating revenues reported on the Forms 10-K filed with the Securities and Exchange Commission (SEC).

[8]

When Medicare is the third-party payer, hospitals can collect only the "Medicare co-payments" from patients.  Should the total payments from Medicare and the patient not equal the total amount billed to the patient, the hospital is not allowed to collect the difference from the patient.

nursing care for newborn infants, and instruct mothers in postnatal self-care and newborn care.

For patients in intensive care units, the nurses and patient attendants provide care of a more sustained and specialized nature than that provided to the usual medical and surgical patients. Nurses and attendants also staff the emergency room.

Acute care hospitals generally provide numerous ancillary services in support of basic hospital and nursing care provided to patients. Ancillary units include laboratories for performing diagnostic and routine laboratory tests of all kinds, a blood bank for procuring, receiving, and storing a supply of blood and blood derivatives to be used in surgery and patient treatment, an electrocardiology department for performing a variety of diagnostic testing of patients with heart disease, a radiology department for taking radiographs and fluorographs (often including a separate cardiac catheterization laboratory, ultrasound laboratory, nuclear medicine facility, angiocardiology center, and other units performing various radiological functions), and an anesthesiology department for assisting in surgery and other in-hospital procedures by administering gases and other anesthetics. The various ancillary departments employ many specially trained personnel who perform specific technical service functions necessary for patient treatment.

As of December 31, 1986, acute care hospitals owned by petitioners were located in 26 States and four foreign countries.

Psychiatric Hospitals

As of January 1, 1981, petitioners did not own any psychiatric hospitals although a number of petitioners' hospitals operated psychiatric wards within them. During 1981, petitioners acquired and operated 22 psychiatric hospitals. At the end of 1986, petitioners operated 39 psychiatric hospitals, which were located in 14 States and one foreign country.

Petitioners' psychiatric hospitals provide for the mid- and long-term treatment of persons suffering from mental and emotional diseases and disorders. Typically, these facilities do not provide the broad range of medical treatment provided by petitioners' acute care hospitals.

Petitioners' psychiatric hospitals employ administrative personnel, nurses, patient attendants, counselors, therapists, pharmacists, and other medical personnel to care for patients with mental and emotional diseases and disorders. The professional personnel working at psychiatric facilities are trained in procedures such as crisis intervention and special therapies for treating mental problems associated with aging, substance abuse, sexual abuse, depression, grief and loss, stress management, and the emotional problems of adolescence, as well as psychotic or chronic disorders. The treatment programs at the psychiatric hospitals emphasize not only therapy and counseling, but also education and the development of communication skills.

Psychiatric treatment is conducted under the direction of and pursuant to a program prescribed by an attending physician.

Services Performed by Certain Hospital Departments

The Central Supply Services Department

The central supply services department (central supply), and sometimes a separate materials management department, purchase and stock the medical and surgical supplies and equipment which are used in the treatment of patients.  When supplies purchased through central supply or materials management are physically stored in other areas of the hospital, such as the operating room or the emergency room, employees of central supply regularly replenish such stock.  Central supply, or a separate autoclave department, also cleans, assembles, maintains, and issues portable apparatus required for patient care, and it collects, assembles, sterilizes, and redistributes reusable items.  All purchasing decisions at petitioners' hospitals are made at the individual hospital level by employees in central supply or the materials management department, although the corporate office does negotiate and provide national purchasing contracts that the local hospitals may use at their option.

The Pharmaceutical Department

Personnel in the pharmaceutical department (often called the pharmacy) procure, store, control, and dispense medications that are used in the treatment of inpatients or outpatients and, when necessary, compound or mix prescribed medications unavailable in

prepackaged unit doses.  Pharmacy items are dispensed only on the order of a physician.

When the pharmacy receives an order from the nursing unit, pharmacy personnel examine the order by (1) reviewing any medications that the patient is already taking and any condition of the patient that may affect what medications the patient should be taking and (2) checking in each case for drug interactions and allergies.  The pharmacy then fills the order, and the medication is dispensed to the nursing unit.  The medication is administered to the patient by a nurse, who records the procedure on a medication administration record (MAR).  At the end of each day, the pharmacy pulls a copy of the original dispensing order and compares it to the MAR to verify that all medications have been administered according to the direction of the physician.  All pharmacy items are prepared and dispensed under the direction of a licensed pharmacist.  The pharmacy department typically employs several pharmacists as well as a number of specially trained technicians.

The pharmacy department also adds medications to intravenous (IV) solutions.  Such medications are referred to as "admixtures."  Admixtures for IV solutions are prepared by pharmacy department personnel under a special hood that filters air to ensure the sterility of the admixture.  These activities require great care and precision and are usually performed by

technicians with special training in the preparation of admixtures.

Although the policy of petitioners' hospitals is not to fill prescriptions for patients after they are discharged from the hospital, on occasion a hospital will do so in a situation of extreme hardship, as, for example, when the medication is not readily available at a commercial pharmacy. The price charged to a patient for filling a discharge prescription is not the same as the charge posted on a patient bill when administered at the hospital, and the charge is not included on the patient's hospital bill. The pharmacy also occasionally sells pharmaceutical products to employees and staff physicians at acquisition cost plus an administration fee. The hospital generally records cash sales of drugs and medicines to employees in an account entitled "retail pharmacy". The pharmacy department does not sell or otherwise provide pharmacy items to the general public.

Purchasing decisions regarding pharmaceuticals are made at the individual hospital level by employees of the hospital, based on formularies established by a hospital committee composed primarily of staff physicians.

Medical Records Department

Each hospital maintains a medical records department that stores and retrieves each patient's medical record. Such record reflects, through contemporaneous recordations by the attending

physician or nurse, a complete summary of all treatment administered to a patient while in the hospital and chronicles the actions taken by the patient's medical doctor and hospital personnel at the direction of the attending physician.  The patient's medical record also records the patient's progress while in the hospital and the patient's reaction to drugs and various medical procedures.

Other Hospital Personnel

Each hospital also employs a staff of engineering and maintenance personnel to repair and to service its nonmedical equipment and a staff of housekeeping and janitorial personnel to maintain required standards of cleanliness.

Petitioners' Use of Supplies

Petitioners' hospitals frequently use various medical supplies in providing medical care to patients.  Each hospital maintains thousands of different types of medical supplies for use in treating a wide variety of medical conditions.

The hospital staff or the attending physician, sometimes after consultation with the patient, decides which medical supplies will be used during the patient's stay.  Patients cannot order a particular medical supply.  Numerous medical supplies are used in performing diagnostic, surgical, and other procedures on patients, including, for example, scalpels and other surgical instruments, sponges, surgical drapes, surgical gowns, towels, syringes, alcohol preparations, drainage and irrigating tubes,

tourniquets, suction tubing and canisters, and various IV tubes, needle hubs, and catheters.

The medical supplies used in the treatment of patients are either reusable or disposable. Reusable medical supplies, such as stainless steel instruments, are sterilized and repackaged after each use. Disposable single-use medical supplies are increasingly used and include IV solution bags, tubing and catheters, syringes, bedpans, diapers, egg crate mattresses, moisture-barrier pads, pillows, surgical drapes, table covers, sterile gloves, towels and linens, kits for surgical shave prep and scrub prior to incision, scalpels with plastic handles, and kits for inserting and removing sutures. The hospital is responsible for discarding disposable medical supplies.

Certain other medical supplies are applied to, implanted in, otherwise administered to, furnished to, or used in connection with the treatment of, patients. Examples include casts, crutches, canes, walkers, bandages, sutures, splints, skin staples, joint replacements, pacemakers, heart valves, orthopedic devices, and physical and occupational therapy items. Such items often leave the acute care hospital with the patient, although medical supplies such as sutures, splints, skin staples, and implants can be removed from the patient only by a physician or other trained medical personnel.

Petitioners' psychiatric hospitals use medical supplies less frequently in the course of treating their patients than

petitioners' acute care hospitals.  The principal medical supplies used in psychiatric facilities are prescription drugs and medicines.  In some instances, medical supplies and equipment might be used in certain treatments, such as insulin therapy, electroshock therapy, and hydrotherapy.

Intravenous Solutions

During a hospital stay, a patient may receive an IV solution.  The administration of an IV solution involves the injection of a prescribed solution directly into the patient's vein, frequently together with prescribed amounts of admixtures.

The administration of an IV involves a number of steps, including preparing the IV solution, mixing in any required admixtures in the appropriate quantities, distributing the solution to the patient floor, assembling the IV apparatus (which may consist of a reusable pump and disposable tubing, connectors, needle hubs, and catheters), setting the rate of flow, monitoring the rate of flow, and monitoring the patient's response to the medication.  Monitoring the rate of flow and the patient's reaction are critical aspects of the administration of an IV because the infusion of the IV fluid at too rapid a rate could harm the patient and the patient could have an adverse reaction to medication administered through the IV.  Once the administration of the IV is complete, the IV apparatus and any unused IV fluid are disposed of in a biohazardous disposal receptacle to be discarded by the hospital.  Typically, the

solution used to administer an IV costs about $1.  The patient charge for the administration of an IV solution is typically about $20.

Blood Transfusions

Patients undergoing surgery or other health care treatments may receive transfusions of blood and blood derivatives. Petitioners' hospitals acquire most of their blood and blood components from the American Red Cross under agreements providing that all blood remains under the jurisdiction of the Red Cross until transfused to the patient.  These agreements prohibit the sale of blood by the hospital.  They also prohibit the hospital from making any charge to the patient other than the processing fee that the hospital pays to the Red Cross plus any charge for the services the hospital renders in administering the blood.

Blood transfusions require typing of the patient's blood, procuring a supply of blood of the proper type, delivering it for administration to the patient, assembling the transfusion apparatus and injecting it into the patient, monitoring the transfusion carefully, detaching the apparatus when the transfusion is completed, and disposing of the apparatus and any remaining blood in accordance with appropriate hospital procedures.

Other Medical Supplies

Many ancillary hospital departments utilize supplies in performing their particular specialties.  For example, x-ray

film, chemicals, dyes, and nuclear materials are used in radiological diagnostic procedures. Anesthetic gases are administered to patients during surgery. Oxygen is administered to patients by the respiratory therapy department. Dyes are injected in patients with possible coronary artery disease during the diagnostic procedure known as cardiac catheterization.

Petitioners' Purchases of Supplies

Petitioners' hospitals purchase medical supplies and medical equipment for use in the treatment of patients. They purchase some of those items from their suppliers (usually the manufacturer of the items) at discounts not available to wholesalers, retailers, or resellers of such items. Most of the pharmaceutical supply contracts entered into by petitioners' hospitals prohibit the resale of pharmaceuticals by the hospitals and limit the hospitals' purchases to items for their own use.

The majority of the medical supplies are physically located in four departments: The operating room, materials management and central supply, the pharmacy, and the laboratory. Each hospital takes physical inventories of its medical supplies at yearend.

For tax years ended 1982 through 1988, petitioners' hospitals claimed the following supplies expenses and total deductions on their consolidated Federal income tax returns:

| Year | Supplies Expenses | Total Deductions |
|------|-------------------|------------------|
| 1982 | $460,994,278 | $2,806,887,860 |
| 1983 | 495,309,714 | 3,003,382,379 |
| 1984 | 511,832,402 | 3,112,503,386 |
| 1985 | 573,913,170 | 3,942,358,533 |
| 1986 | 674,200,054 | 4,650,746,958 |
| 1987 | 648,445,800 | 4,501,953,880 |
| 1988 | 561,721,210 | 3,655,162,924 |

Petitioners reported the following supplies expenses and total expenses on their books for the years ended 1981 through 1986:

| Year | Supplies Expenses | Total Expenses |
|------|-------------------|----------------|
| 1981 | $282,265,685 | $1,481,029,776 |
| 1982 | 405,666,204 | 2,229,237,905 |
| 1983 | 435,068,134 | 2,316,952,040 |
| 1984 | 453,784,846 | 2,454,214,828 |
| 1985 | 511,141,278 | 2,968,564,755 |
| 1986 | 583,139,057 | 3,364,050,625 |

For taxable years ended 1981 through 1986, the cost of medical supplies compared to total hospital expenses, including amortization and depreciation, and compared to total revenue is as follows:

| Year | Percent of Supplies to Total Expenses | Percent of Supplies to Total Revenue |
|------|---------------------------------------|--------------------------------------|
| 1981 | 15.76% | 15.19% |
| 1982 | 15.28 | 14.08 |
| 1983 | 15.47 | 13.80 |
| 1984 | 15.02 | 13.36 |
| 1985 | 13.56 | 12.73 |
| 1986 | 13.17 | 12.29 |

Hospital Billing Practices

The format for hospital bills used by petitioners' hospitals follows the outline of a uniform bill developed by the health insurance industry in conjunction with the Health Care Financing

Administration and private insurance companies.  The patient is furnished a summary bill that shows separate charge categories such as patient room charges, pharmacy, medical/surgical supplies, and laboratory.  Upon request, the patient can receive a more detailed bill that itemizes each separate charge within the broad categories.

The particular type of medical care provided to the patient determines how items are listed on a summary bill.  For example, the bill often identifies charges by location, such as patient room, operating room, recovery room, delivery room, nursery, emergency room, or intensive care unit.  The bill may also identify charges by procedures, such as radiology, anesthesia, nuclear medicine, various laboratory procedures (including endoscopy, electrocardiology, echogram, electromyogram, cardiac function, cardiac catheterization, electroencephalography, computerized axial tomography, ultrasound, and angiocardiology), inhalation therapy, pulmonary function, physical therapy, hemodialysis, and occupation therapy.  The detailed bill may identify charges by the name and/or code of a particular medical supply used in diagnosing or treating the patient.

Central supply breaks down certain medical supplies that are received in bulk into separate "issue units".  On each issue unit it places a sticker which includes a procedure code number and a short description of the item.  When a medical supply with a sticker is used in treating the patient, the nurse peels off the

sticker and puts it on the patient's daily charge card.  The patient's daily charge cards for all departments, except the operating room and pharmacy, are sent back to central supply where each item's procedure code is keyed into a hospital computer terminal which is connected directly with the main data center at HCA's corporate office in Nashville, Tennessee.  The appropriate charge to the patient's account is made automatically for a later billing to the patient.

When a medical supply is used during a surgical procedure in the operating room, the nurse checks the item off on a "charge sheet" maintained in the name of each patient undergoing a surgical procedure.  After the conclusion of the surgical procedure, the charge sheet is used by operating room personnel to key the appropriate item procedure codes into the computer for posting to the patient's account.

All orders for medications for a patient are listed on a MAR prepared for that patient and delivered by the pharmacy department to the attending nurse station.  The nurse checks off each item of medication on the MAR as it is administered to the patient.  A copy of the MAR is returned to the pharmacy department, which then inputs the appropriate patient charge into the hospital computer terminal.

Each hospital's computer procedure file contains all of the hospital's procedure codes for various patient procedure charges, including those in which medical supplies are used.  When

hospital personnel input a patient number and a procedure code for a charge, the procedure file automatically posts the charge amount to "Accounts Receivable--Patient", to a general ledger revenue account, and to the patient's account.  The patient charge amount for many individual procedures involving a medical supply is determined by the hospital based on a schedule of algorithms input into the computer.  The schedule of algorithms typically determines the charge for a procedure involving a medical supply as a multiple of the cost of the item used or as a multiple of the average wholesale price of the pharmaceutical used.  The amount of that multiple varies from item to item and ranges from 150 percent of cost to well over 4,000 percent of cost.

Each hospital's computer room master file contains all hospital room numbers and their respective rates.  The room master file automatically posts room charges daily, not only to "Accounts Receivable--Patient" and to a general ledger revenue account, but also to the patient's account and to the billing or receivable system.

A charge for nursing care is not separately listed on either the summary or the detailed bills provided to the hospitals' patients.  The charge for nursing is included in the charge for the room, in the charge identified by location, and in the other charge categories, including the cost of certain medical supplies used for patients.

Petitioners' system of billing, typical of most hospitals, has evolved over time in conformity with the reimbursement practices and procedures of private insurance companies as well as Medicare and Medicaid, and in conformity with State laws and regulations. During the beginning of the 20th century, hospitals typically charged for their services on a per-case or per diem basis. Subsequently, with the advent of the private health insurance industry, particularly Blue Cross/Blue Shield organizations, pressure was placed on hospitals to develop a charging structure which would enable the insurer to measure the degree of service furnished to each patient so that the insurer company could assure itself that it was not subsidizing the cost of care furnished to other patients. Consequently, insurance companies required hospitals to detail charges and to bill for services on a departmental basis.

Until 1983, Medicare and Medicaid paid hospitals based on the cost of services as computed under a formula using the detailed charges listed by the hospitals. Effective with Medicare cost reporting periods beginning on and after October 1, 1983, however, Medicare began to phase in, over a 3-year transition period, its system of paying hospitals for inpatient services on the basis of diagnostic related groups (DRG's). Under that system, hospitals are paid a flat amount for a particular procedure, such as a gall bladder operation, regardless of the precise course of treatment administered to the

patient, the length of the hospital stay, or the number and type of medical supplies used. Additional payments, however, may be made to hospitals for discharges involving an extremely long stay or unusually high costs when compared to most discharges classified in the same DRG. Managed care networks, HMO's, and some insurance companies also employ similar reimbursement practices.

Between 70 and 80 percent of hospital bills are paid on the basis of DRG's or some other negotiated per case or per diem basis. In most cases, the itemized bill does not bear any particular relationship to the amount that actually will be due the hospital for the services provided. Hospitals, however, continue to detail charges in their bills because Medicare and insurance companies continue to require such itemization.

Insurers pay some types of hospital stays based on detailed itemized charges, such as outpatient hospital stays and psychiatric stays. Uninsured patients with the ability to pay are presented with a complete bill and may be held liable for payment of the full amount.

For most of their income, hospitals contemplate receiving two or more payments on behalf of the patient, consisting of one or more payments from third-party payers and one or more payments of a deductible or copayment amount by the patient.

Petitioners' Accounting System

Petitioners maintain the hospitals' books and records on a functional accounting system which separates the various functions of operating a hospital into general ledger cost centers whether or not those functions represent separate responsibility cost centers. Accordingly, revenues and expenses for the same function are recorded in the related revenue and expense centers[9] shown in petitioners' chart of accounts.[10] The hospitals' revenue centers generally are classified into routine services and ancillary services. Examples of routine service revenue centers are Medical & Surgical Acute Care, Intensive Care--Medical, and New Born Care. Examples of routine ancillary revenue centers are Central Supply, Laboratory, and Blood Bank. Additional details indicated in the accounting system are the classification of the particular revenue within the revenue center, such as inpatient or outpatient revenue, the type of payment expected with respect to the patient, and the

---

[9]

For example, the central supply center would be credited or charged with all direct revenues and expenses incurred in preparing and issuing medical and surgical supplies and other equipment to patients. Appropriate subaccounts would be established to accumulate the expenses of the center under classifications such as salaries and wages, professional fees, supplies, etc.

[10]

A chart of accounts is a listing of account titles, with numerical symbols, employed in the compilation of accounting data concerning the assets, liabilities, capital, revenue, and expenses of an enterprise. American Hospital Association, Chart of Accounts for Hospitals 25 (1966 ed.).

identification of specific medical supplies used while performing a particular hospital procedure.  Costs classified as Payroll, Fees, and Cost of Sales--Supplies, Repairs, Leases and Rental, must be recorded in the cost centers responsible for incurring and controlling such costs.  Supplies are charged to operations during the period in which they are consumed or expended.  Petitioners use a specific identification requisition system to identify and allocate appropriate supply costs to the consuming cost center and to identify the period in which the supplies were consumed.  Fixed costs (such as depreciation, interest, rent, taxes, and insurance), employee benefits, and certain overhead costs (such as maintenance and repairs) are not departmentalized under petitioners' accounting system but are recorded in specified cost centers.

Thus, under petitioners' accounting system, petitioners track patient revenue, operating expenses, and gross margins for each hospital.  They also track financial operating indicators on such items as revenue, labor costs, and supply costs, among others.  The hospitals also maintain separate accounts for such categories as Operating Room, Central Supply, Laboratory, Pharmacy, Dietary, Plant Operations & Maintenance, Linen, and Housekeeping.

Petitioners' Chart of Accounts

Petitioners' hospitals record their revenue and expenses pursuant to a uniform chart of accounts promulgated by HCA's

corporate offices in Nashville.  Petitioners' hospitals are required to follow HCA's chart of accounts in recording all revenue and expense items.  The revenue and expense center section of the chart of accounts lists the functions that normally are performed in a hospital.  Each hospital is expected to establish a functional cost center for each material function that it performs.  The HCA chart of accounts gives individual hospitals a certain degree of flexibility in selecting which accounts to use to track costs and revenue.  Hospitals are permitted to establish separate, more detailed, accounts within ranges prescribed by the chart of accounts.  For example, hospitals might establish separate accounts, within the prescribed range, to record revenue and expenses related to the use of medical supplies in the operating room, the emergency room, and other areas of the hospital.

The HCA chart of accounts is based upon the Chart of Accounts for Hospitals published by the American Hospital Association (AHA).  The AHA strongly recommends to its member hospitals the use of an accrual method of accounting for financial accounting purposes to insure completeness, accuracy, and meaningfulness of accounting data.

Accounting Methods Used by Petitioners and in the Hospital Industry

Before 1987, for financial reporting purposes, many non-profit and for-profit hospitals used an accrual method of

accounting. During that time for tax purposes, however, many nonprofit hospitals used an accrual method of accounting while many for-profit hospitals used the cash method or a hybrid method of accounting.[11] Petitioners use an accrual method of accounting for financial reporting purposes and for reporting to the Securities and Exchange Commission (SEC).

Tax Returns and History of Use of Method of Tax Accounting

HCA adopted and used an accrual method of accounting for Federal income tax purposes on its initial Federal income tax return and continues to use such method. Before the taxable year ended 1979, most of HCA's hospitals and other subsidiaries used the cash method of accounting in reporting taxable income for Federal income tax purposes on the returns as originally filed.

For each taxable year ended before 1987, HCA's Tax Department prepared records to reconcile income determined on the accrual method used for financial reporting purposes and income computed on the cash method used for tax reporting purposes. HCA's Tax Department retained the results of the computations made in arriving at cash method taxable income as shown on petitioners' Federal income tax returns and made those results

---

[11]
    Sec. 448, which was added to the Code by sec. 801 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2345, wherein Congress required certain corporations, including hospitals, to change prospectively beginning in 1987 to an overall accrual method, does not apply to the accounting issue under discussion in the instant opinion.

available to respondent's agents examining petitioners' books and returns.

### 1972-73 Audit

At the end of 1973, petitioners owned and operated 45 hospitals. During an examination of petitioners' corporate income tax returns for the taxable years ended 1972 and 1973, the Internal Revenue Service (IRS) District Director, Nashville, Tennessee, proposed a number of adjustments, including a proposal to change the method of accounting of HCA's hospitals using the cash method to an accrual method.

As grounds for the proposal to place those hospitals on an accrual method of accounting, the revenue agent's report (RAR) asserted, inter alia, that, because inventories were material and had a direct effect on taxable income, the cash method did not properly reflect income. The RAR also asserted that the cash method did not properly reflect petitioners' income, regardless of inventories, because the cash method did not match revenue with expenditures. Furthermore, the RAR indicated that petitioners had not obtained the approval of the Commissioner of Internal Revenue (Commissioner) to change the method of accounting from the accrual basis used to maintain their books and records to the cash method used for tax purposes. Additionally, the RAR stated that, because the purchase or sale of merchandise was an income-producing factor for petitioners' hospitals, they were required to use inventories pursuant to

section 1.446-1(a)(4)(i), Income Tax Regs.  The RAR further asserted that the existence of merchandise inventories required the hospitals to use an overall accrual method.

In disagreeing with the proposed adjustments, petitioners contended that they were entitled to use the cash method in reporting their income because the hospitals merely used or consumed various medical supplies in the course of providing typical hospital services.  Subsequently, the Commissioner issued a notice of deficiency for the years ended 1972 and 1973. Petitioners timely filed a petition in the U.S. Tax Court challenging the proposed change in accounting method as well as certain other determinations of the Commissioner.  The issues raised in the petition, including the accounting method adjustment, were then referred for consideration to the IRS Appeals Office in Nashville (Nashville Appeals Office).  The Nashville Appeals Office considered the case in early 1980.[12]

---

[12] Respondent objects to the admission of evidence relating to consideration of the proposed adjustments for the years ended 1972 and 1973 by the Nashville Appeals Office on the ground that the discussions with the Appeals officers were settlement negotiations and, thus, evidence relating to such matters is inadmissible pursuant to Fed. R. Evid. 408, which generally renders inadmissible evidence of compromises and offers to compromise.  We have held in a prior opinion in the instant case that evidence relating to the resolution of such matters is not excludable under Fed. R. Evid. 408 because the evidence was not presented to show the validity or invalidity of petitioners' claim that the hybrid method clearly reflects income.  Hospital Corp. of America v. Commissioner, T.C. Memo. 1994-100; see also Wentz v. Commissioner, 105 T.C. 1, 5-7 (1995).

Two Appeals officers were assigned to the case, Hubert Johnson (Appeals Officer Johnson) and Robert Sinclair (Appeals Officer Sinclair). Appeals Officer Johnson was responsible for the method of accounting issue, but both Appeals officers attended the conferences relating to the accounting method issue. Petitioners' tax director, Terry Deaton (Mr. Deaton), and petitioners' in-house counsel, Charles L. Kown (Mr. Kown), among others, represented petitioners during the negotiations with the Nashville Appeals Office regarding the accounting method issue.

In an effort to resolve the case, Appeals Officer Johnson proposed that the hospitals report a portion of their income and related expenses on an accrual method and the balance of income and related expenses on the cash method (hereinafter sometimes referred to as the hybrid method). Petitioners agreed to the proposal. Under the hybrid method, the amount included in income on an accrual basis was computed by multiplying each hospital's year-end patient receivables by the ratio of total revenue in the Central Supply and Pharmacy accounts to total revenue in all patient revenue accounts.

Appeals Officer Johnson and petitioners' representatives agreed to petitioners' use of a reserve method of accounting for bad debts,[13] calculated by applying the "Black Motor" formula, in

---

[13] HCA's Chart of Accounts defines bad debts as "accounts which are deemed uncollectible from the patient or any third party due
(continued...)

conjunction with the hybrid method.  See <u>Black Motor Co. v.</u> <u>Commissioner</u>, 41 B.T.A. 300 (1940), affd. 125 F.2d 977 (6th Cir. 1942).  Additionally, they agreed that the cost of medical supplies was to be capitalized in a supply inventory and deducted only when such supplies were consumed in the course of treating the patient, rather than when the supplies were purchased.

During their negotiations with Appeals Officer Johnson, one of petitioners' representatives requested a closing agreement relating to the use of the hybrid method, but Appeals Officer Johnson refused because he knew that petitioners' returns for subsequent taxable years were already under examination and he did not want to preclude resolution of such years on a different basis.  Appeals Officer Johnson and Appeals Officer Sinclair viewed the resolution of the 1972 and 1973 years as "merely a settlement on the basis of the hazards of litigation."  They did not intend for their actions to effectuate a change in method of accounting for the hospitals.  Neither Appeals Officer Johnson nor Appeals Officer Sinclair believed that, as a result of their actions, the IRS was bound to permit the use of the hybrid method by the hospitals for subsequent years.

Mr. Deaton and Mr. Kown, however, believed that petitioners' method of accounting for the hospitals had been changed to the hybrid method by the IRS as a result of the

---

[13](...continued)
to the patient's unwillingness or inability to pay."

agreement they reached with Appeals Officers Johnson and Sinclair. During the negotiations, Mr. Deaton informed Appeals Officer Sinclair that petitioners would file their consolidated 1979 return using the hybrid method even though such return had initially been prepared on the cash method and the time for filing was near. Mr. Kown would not have agreed to adopt the hybrid method for the 1972 and 1973 years had he known that the IRS would object to its use for petitioners' returns filed for subsequent taxable years.

In an attempt to memorialize his understanding of the agreement with Appeals Officers Johnson and Sinclair, Mr. Kown wrote them a letter on June 13, 1980, in which he outlined his understanding of the proposed resolution of the accounting method issue. Mr. Kown further stated that it was petitioners' understanding that their agreement with respect to such issue would be binding until Congress expressly prohibited the hybrid method of accounting by hospitals. Mr. Kown sent the letter prior to the time the stipulations regarding such issues were prepared and filed with the U.S. Tax Court. He did not receive a written response to his letter but he subsequently discussed it in a telephone conversation with Appeals Officer Sinclair. At such time, Appeals Officer Sinclair, while "making no promises", indicated that he thought that the hybrid method would continue to be followed unless a statutory change or a final controlling court decision required a different result.

The adjustments calculated for 1972 pursuant to the hybrid method included adjustments resulting from the changes in accounts receivable, accounts payable, and supplies for 1972, and also the cumulative balances in such accounts. No adjustment was made to subtract the corresponding portion of 1971 year-end accounts receivable (i.e., the beginning of the year balance for 1972). The adjustment for taxable year ended 1973 was computed in the same manner, except that the amount that was included in income for 1972 was subtracted from the 1973 year-end cumulative balance to determine the amount to be included for 1973. The resolution of the accounting adjustment and certain other adjustments raised in the notice of deficiency issued for taxable years ended 1972 and 1973 were reflected in a stipulation filed with the U.S. Tax Court. Petitioners litigated another issue for taxable years ended 1972 and 1973 in the U.S. Tax Court.[14]

### 1974-75 Audit

While the Nashville Appeals Office was considering the resolution of petitioners' taxable years ended 1972 and 1973, a team of revenue agents concluded their audit of petitioners' returns for taxable years ended 1974 and 1975. The RAR for those years raised numerous issues, including a challenge to the use of the cash method of accounting by some of HCA's subsidiaries. The

---

[14] See Hospital Corp. of America v. Commissioner, 81 T.C. 520 (1983).

examination for the taxable years ended 1974 and 1975 was suspended, however, when petitioners filed their petition with the Tax Court relating to the same accounting issue for the taxable years ended 1972 and 1973.

After the accounting method issue for the taxable years ended 1972 and 1973 was resolved, the examination of petitioners' returns for the taxable years ended 1974 and 1975 resumed. Following consultation with the Nashville Appeals Office, the revenue agents revised the RAR to compute petitioners' taxable income for taxable years ended 1974 and 1975 using the hybrid method, but modified to include in patient receivables the net debit balances shown as due from Medicare and Medicaid (hereinafter sometimes referred to as the hybrid method as modified). Petitioners agreed to those adjustments and paid the resulting deficiencies for the taxable years ended 1974 and 1975.

### 1976-78 Audit

In March 1980, a team of revenue agents commenced an examination of petitioners' returns for the taxable years ended 1976 through 1978. The cash method of accounting had been used by most of HCA's subsidiaries for such years. The revenue agents did not propose to change the hospitals to an overall accrual method of accounting, but rather, after discussions with the Nashville Appeals Office and pursuant to instructions from their case manager, they used the hybrid method as modified to compute income for the hospitals for the years ended 1976 through 1978.

Petitioners accepted the proposed adjustments and paid the resulting deficiencies.

Returns Filed Under the Hybrid Method

For the taxable year ended 1979, most of HCA's hospitals used the hybrid method for reporting income for Federal tax purposes.[15] To reconcile each hospital's income recorded on the accrual method used for financial reporting purposes to the hybrid method used for Federal income tax purposes, HCA's Tax Department prepared records (referred to as cash conversions) reflecting the appropriate adjustments. When filing the return for taxable year ended 1979, petitioners did not increase year-end patient accounts receivable to which the hybrid method percentage was applied to include the net debit balance of Medicare and Medicaid receivables as proposed and agreed to on audit of the returns filed for the years ended 1974 and 1975, because petitioners had filed the return for taxable year ended 1979 before the conclusion of the examination of the returns filed for taxable years ended 1974 and 1975. For taxable year ended 1980 the hospitals included the net debit balance of

---

[15]

The number of hospitals owned by petitioners reporting for Federal income tax purposes on an accrual method and the hybrid method for each of the years ended 1979 through 1986 were:

|  | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|---|
| Accrual | 13 | 14 | 16 | 17 | 15 | 15 | 16 | 15 |
| Hybrid | 76 | 87 | 155 | 170 | 174 | 183 | 218 | 228 |

Medicare and Medicaid receivables in patient receivables for purposes of calculating the revenue to be reported on the accrual method.

### 1979-80 Audit

A team of revenue agents examined petitioners' returns for the taxable years ended 1979 and 1980 and proposed in their RAR to change, inter alia, the hospitals' method of accounting from the hybrid method, or the hybrid method as modified, to an overall accrual method. The reasons cited in the RAR were essentially identical to the reasons cited in the RAR's for the 1972-73, 1974-75, and 1976-78 audits. In addition, the RAR contended that the returns filed using the hybrid method, or the hybrid method as modified, were difficult to audit.

At petitioners' request, the accounting issue was referred for consideration to the Atlanta, Georgia, Appeals Office. The Appeals Officer reviewing the returns for taxable years ended 1979 and 1980, Appeals Officer Griffin, concluded that the accounting method issue adjustment for the years ended 1972 and 1973 appeared to have been computed as a change in method of accounting, rather than as an adjustment relating to those years alone and that use of the hybrid method as modified clearly reflected income of the hospitals. Accordingly, in November 1986 Appeals Officer Griffin resolved the proposed accounting method adjustment for the years ended 1979 and 1980 by permitting

petitioners to use the hybrid method as modified, but adjusting for the years under consideration the fraction used to determine the portion of patient receivables to be reported on an accrual method by including in the numerator of that fraction the revenue included in certain additional accounts which were similar in nature to the Central Supply and Pharmacy accounts so as to correct for perceived deviations from the hybrid method agreed to for the earlier years (hereinafter referred to as the hybrid method as further modified).  The inclusion of the revenue from such additional accounts raised the percentage of year-end patient receivables being reported on an accrual method by approximately one and one-half percentage points.

Returns for the Years in Issue

The accounting method adjustment for petitioners' taxable years ended 1979 and 1980 was resolved in December 1986, at which time petitioners' returns for the taxable years ended 1981 through 1985 already had been filed.  For such years the hospitals used the hybrid method as modified for reporting taxable income.

Petitioners also used the hybrid formula as modified, rather than the hybrid formula as further modified, for the return they filed for taxable year ended 1986 because they were informed that respondent's revenue agents auditing the returns for taxable years ended 1981 and 1982 intended to challenge petitioners' use of the hybrid method for those years.  The teams of agents

assigned to audit petitioners' returns for taxable years ended 1983 and 1984 and taxable years ended 1985 and 1986 likewise challenged petitioners' use of the hybrid method as modified for reporting taxable income of the hospitals.

Without considering the effect of other adjustments, the use of an overall accrual method of accounting would increase petitioners' income for the taxable years ended 1981 through 1986 as set forth in the following table:

| Year | Amount |
|------|--------|
| 1981 | $197,470,976 |
| 1982 | 41,916,668 |
| 1983 | 68,510,810 |
| 1984 | 95,125,139 |
| 1985 | 122,573,714 |
| 1986 | 62,405,334 |

For taxable years ended 1981 through 1986, the percentages of revenue derived from operations of petitioners' U.S.-owned hospitals from room and board (including nursing services) and ancillary services, as reported on Forms 10-K that petitioners filed with the SEC, were as follows:

|  | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|--|------|------|------|------|------|------|
| Room and board | 34% | 34% | 33% | 32% | 30% | 27% |
| Ancillary services | 66 | 66 | 67 | 68 | 70 | 73 |

Ancillary services include, among other things, outpatient treatments; physiotherapy; the use of the operating room, the recovery room, the delivery room, or special facilities; examinations; laboratory tests; x-rays; EKG's; as well as the administration or use of medical supplies.  For psychiatric

hospitals, ancillary services include group and individual therapy.

OPINION

Section 446(a)[16] requires a taxpayer to compute taxable income under the method of accounting it regularly uses in

-------------------

[16] Sec. 446 provides in pertinent part as follows:

SEC. 446.  GENERAL RULE FOR METHODS OF ACCOUNTING.

(a)  General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b)  Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

(c)  Permissible Methods.--Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting--

(1)  the cash receipts and disbursements method;
(2)  an accrual method;
(3)  any other method permitted by this chapter; or
(4)  any combination of the foregoing methods permitted under regulations prescribed by the Secretary.

(d)  Taxpayer Engaged in More Than One Business.--A taxpayer  engaged in more than one trade or business may, in computing taxable income, use a different method of accounting for each trade or business.

(e)  Requirement Respecting Change of Accounting Method.--Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

keeping its books.  Section 446(b), however, provides that if the method of accounting regularly utilized by the taxpayer does not clearly reflect taxable income, the computation of taxable income shall be made under such method as, in the Commissioner's opinion, does clearly reflect income.  The Commissioner's authority under section 446(b) reaches not only overall methods of accounting but also a taxpayer's method of accounting for specific items of income and expense.  Ford Motor Co. v. Commissioner, 102 T.C. 87, 100 (1994), affd. 71 F.3d 209 (6th Cir. 1995); Prabel v. Commissioner, 91 T.C. 1101, 1112 (1988), affd. 882 F.2d 820 (3d Cir. 1989); sec. 1.446-1(a), Income Tax Regs.

It is well recognized that section 446 grants the Commissioner broad discretion in matters of accounting and gives the Commissioner wide latitude to adjust a taxpayer's method of accounting so as to reflect income clearly.  E.g., Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979); Commissioner v. Joseph E. Seagram & Sons, Inc., 394 F.2d 738, 743 (2d Cir. 1968), revg. 46 T.C. 698 (1966); Thomas v. Commissioner, 92 T.C. 206, 220 (1989).  Section 446 imposes a heavy burden of proof on a taxpayer disputing the Commissioner's determination on accounting matters.  Thor Power Tool Co. v. Commissioner, supra at 532-533.  To prevail, a taxpayer must establish that respondent's determination is "clearly unlawful" or "plainly arbitrary".  Id.

Nonetheless, where a taxpayer's method of accounting does clearly reflect income, respondent cannot require the taxpayer to change to a different method even if the Commissioner's method more clearly reflects income. Ford Motor Co. v. Commissioner, 71 F.3d at 213; Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995); Molsen v. Commissioner, 85 T.C. 485, 498 (1985). Additionally, the Commissioner may not require a taxpayer to adopt a method of accounting which does not clearly reflect income. Rotolo v. Commissioner, 88 T.C. 1500, 1514 (1987). Our inquiry is limited to the question of whether the accounting method in issue clearly reflects income, and we do not decide whether a method is superior to other possible methods. RLC Indus. Co. v. Commissioner, 98 T.C. 457, 492 (1992), affd. 58 F.3d 413 (9th Cir. 1995); see also Brown v. Helvering, 291 U.S. 193, 204-205 (1934).

Generally, a taxpayer's accounting method clearly reflects income if it results in accurately reported taxable income under a recognized method of accounting. Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 354 (1st Cir. 1970), affg. T.C. Memo. 1969-79; RLC Indus. Co. v. Commissioner, supra at 490; see also Honeywell Inc. v. Commissioner, T.C. Memo. 1992-453, affd. without published opinion 27 F.3d 571 (8th Cir. 1994).[17] Whether

---

[17] To determine whether an accounting method clearly reflects income, the Court of Appeals for the Sixth Circuit, to which an
(continued...)

a particular method of accounting clearly reflects income is a question of fact which must be decided on a case-by-case basis. Ansley-Sheppard-Burgess Co. v. Commissioner, supra; Peninsula Steel Prods. & Equip. Co. v. Commissioner, 78 T.C. 1029, 1045 (1982). The Court's task is not to determine whether, in its own opinion, the taxpayer's method of accounting clearly reflects income but to determine whether there is an adequate basis in law for the Commissioner's conclusion that it does not. American Fletcher Corp. v. United States, 832 F.2d 436, 438 (7th Cir. 1987); RCA Corp. v. United States, 664 F.2d 881, 886 (2d Cir. 1981); Ansley-Sheppard-Burgess Co. v. Commissioner, supra.

Financial and tax accounting treatment may often diverge. Thor Power Tool Co. v. Commissioner, supra at 542-544; Challenge Publications, Inc. v. Commissioner, 845 F.2d 1541, 1546 (9th Cir. 1988), affg. T.C. Memo. 1986-36. Consequently, even if a method of accounting comports with Generally Accepted Accounting Principles (GAAP), the method will not control for tax purposes if it does not clearly reflect income. Thor Power Tool Co. v. Commissioner, supra at 538-544; see also Hamilton Indus., Inc. v.

---

[17](...continued)
appeal in the instant case would lie absent stipulation to the contrary, follows the standard enunciated in Caldwell v. Commissioner, 202 F.2d 112, 115 (2d Cir. 1953), that "income should be reflected with as much accuracy as standard methods of accounting practice permit." Asphalt Prods. Co. v. Commissioner, 796 F.2d 843, 849 (6th Cir. 1986), affg. in part and revg. in part Akers v. Commissioner, T.C. Memo. 1984-208, revd. per curiam on another issue 482 U.S. 117 (1987).

Commissioner, 97 T.C. 120, 128 (1991); UFE, Inc. v. Commissioner, 92 T.C. 1314, 1321 (1989); Sandor v. Commissioner, 62 T.C. 469, 477 (1974), affd. 536 F.2d 874 (9th Cir. 1976). Moreover, an accounting method that conforms to GAAP, but does not comply with the Commissioner's regulations, may not clearly reflect income. Peninsula Steel Prods. & Equip. Co. v. Commissioner, supra.

Section 446(c) specifically recognizes as permissible methods of accounting, the cash receipts and disbursements method (cash method), an accrual method, any other method permitted by chapter 1 of the Internal Revenue Code, or any combination of the foregoing methods permitted under regulations prescribed by the Secretary of the Treasury (a hybrid method). Generally, under the cash method of accounting, an item of income or expense is reported when received or paid, without regard to the economic events giving rise to the item. Under an accrual method of accounting, on the other hand, an item of income or expense generally is reported for the accounting period during which all the events have occurred which fix the taxpayer's right to receive the item of income or which establish the fact of liability giving rise to the deduction, and the amount thereof can be determined with reasonable accuracy.[18] Hallmark Cards,

---

[18]

For years after 1984, sec. 461(h) also requires the occurrence of economic performance with respect to a liability.

Inc. v. Commissioner, 90 T.C. 26, 32 (1988); secs. 1.446-
1(c)(1)(ii), 1.451-1(a), Income Tax Regs.

Petitioners contend that respondent's determination
requiring the hospitals to change from the hybrid method to an
overall accrual method was an abuse of respondent's discretion
because, during earlier audits, respondent had changed those
hospitals from the cash method to the hybrid method and, in
subsequent audits, had reviewed and approved the use of the
hybrid method.  Petitioners assert that, in changing the
hospitals to the hybrid method, respondent necessarily determined
that the hybrid method clearly reflected the hospitals' income
and that during the years in issue there were no changes in the
law or the facts which would cause the hybrid method to fail in
continuing to reflect income clearly.  Accordingly, petitioners
contend, respondent cannot now change the hospitals to an overall
accrual method for the years in issue.

On the other hand, respondent contends that no change in
petitioners' method of accounting was approved by respondent as
clearly reflecting income when respondent's agents resolved the
examinations of petitioners' returns for taxable years ended 1972
through 1980.  Accordingly, respondent contends, the resolution
of those years by the agreement to use the hybrid method was
merely for "settlement" purposes.  Respondent also contends that
the hospitals purchased and sold inventory, and, consequently,
they must use an accrual method for the taxable years ended 1981

through 1986, as mandated by section 1.446-1(c)(2), Income Tax Regs.,[19] regardless of any determination respondent may have made for taxable years ended 1972 through 1980. Additionally, respondent contends that petitioners' hybrid method does not clearly reflect income.

The parties devoted a considerable portion of their briefs to advocating their respective positions that respondent did or did not change the hospitals to the hybrid method of accounting as part of the resolution of the audit of petitioners' returns

_____

[19]

    Sec. 1.446-1(c)(2), Income Tax Regs., provides as follows:

    (2) Special rules. (i) In any case in which it is necessary to use an inventory the accrual method of accounting must be used with regard to purchases and sales unless otherwise authorized under subdivision (ii) of this subparagraph.

    (ii) No method of accounting will be regarded as clearly reflecting income unless all items of gross profit and deductions are treated with consistency from year to year. The Commissioner may authorize a taxpayer to adopt or change to a method of accounting permitted by this chapter although the method is not specifically described in the regulations in this part if, in the opinion of the Commissioner, income is clearly reflected by the use of such method. Further, the Commissioner may authorize a taxpayer to continue the use of a method of accounting consistently used by the taxpayer, even though not specifically authorized by the regulations in this part, if, in the opinion of the Commissioner, income is clearly reflected by the use of such method. See section 446(a) and paragraph (a) of this section, which require that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books, and section 446(e) and paragraph (e) of this section, which require the prior approval of the Commissioner in the case of changes in accounting method.

for taxable years ended 1972 and 1973. As will be discussed more
fully below, we conclude that the hybrid method of accounting
clearly reflects petitioners' income for the years in issue[20]
and, consequently, it was an abuse of discretion for respondent
to change petitioners to an overall accrual method of accounting
for the years ending 1981 through 1986.[21] Accordingly, we need
not, nor do we, address herein the issue of whether respondent
changed the hospitals' method of accounting during an earlier
audit.[22]

---

[20]

     As noted supra note 11, beginning in 1987, petitioners are
required by sec. 448 to use an overall accrual method.

[21]

     Although petitioners contend in their briefs that the cash
method is an appropriate method of accounting for the hospitals,
they do not assert a claim that tax for each of the years ended
1981 through 1986 should be recomputed under the cash method, and
they concede that the hybrid method of accounting clearly
reflects their income for those years. Accordingly, we deem
petitioners' failure to assert a claim for recomputation of tax
under the cash method of accounting as a concession that income
should be reported on the hybrid method of accounting for the
years ended 1981 through 1986.

[22]

     Respondent argues that the change of accounting method issue
is in reality a change from the cash method to the accrual
method. Respondent, however, does not seek to hold petitioners
to the cash method of accounting. Rather, respondent seeks to
impose a different method. Under such circumstances, the consent
of the Commissioner under sec. 446(e), which requires the
Commissioner's prior consent to a change of method of accounting
for computing income, generally is not required. See Convergent
Technologies, Inc. v. Commissioner, T.C. Memo. 1995-320 ("When
* * * [the Commissioner] does not seek to hold a taxpayer to a
previously adopted method of accounting but rather seeks to
impose another method in place of the one utilized by the
taxpayer, the consent of * * * [the Commissioner] under section

(continued...)

The parties' briefs also extensively debated the question of whether petitioners' sales of medical supplies are sales of merchandise which would require the maintenance of inventories and an overall accrual method of accounting. Specifically, petitioners contend that the large inventories of medical supplies maintained by the hospitals are not merchandise sold to patients. They argue that their hospitals are engaged in service businesses and that such supplies do not fit the definition of merchandise, i.e., goods acquired or produced for sale to customers in the ordinary course of business at a profit, but are merely items used in the course of providing medical services. Accordingly, petitioners maintain that the hospitals are not required to use an accrual method of accounting for their medical supplies. Alternatively, petitioners contend that, even if the medical supplies are merchandise, the hybrid method as further modified specifically is permitted under respondent's regulations and clearly reflects the income of the hospitals.

Respondent contends, on the other hand, that section 471 does not require that merchandise be sold, only that it be purchased and then used in some way to produce income. Accordingly, respondent contends that section 1.471-1, Income Tax

22(...continued)
446(e) is generally not required" (citing Silver Queen Motel v. Commissioner, 55 T.C. 1101 (1971) and Foley v. Commissioner, 56 T.C. 765 (1971))).

Regs.,[23] is not limited to goods held for sale to retail customers, or even just to sale transactions, but is broad enough to capture every transaction in which petitioners' hospitals use a medical supply in treating a patient.  Respondent maintains that medical supplies are considered to be merchandise in the business of the respective manufacturers, wholesalers, and retailers which manufacture, distribute, and sell the medical supplies; that the medical supplies continue to be merchandise

---

[23]

Sec. 1.471-1, Income Tax Regs., provides in part as follows:

§ 1.471-1 Need for inventories.

In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor.  The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, in which class fall containers, such as kegs, bottles, and cases, whether returnable or not, if title thereto will pass to the purchaser of the product to be sold therein.  Merchandise should be included in the inventory only if title thereto is vested in the taxpayer. Accordingly, the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract and goods out upon consignment, but should exclude from inventory goods sold (including containers), title to which has passed to the purchaser.  A purchaser should include in inventory merchandise purchased (including containers), title to which has passed to him, although such merchandise is in transit or for other reasons has not been reduced to physical possession, but should not include goods ordered for future delivery, transfer of title to which has not yet been effected.

when purchased by petitioners' hospitals; and that the medical supplies therefore are merchandise which must be inventoried and are subject to section 471. Respondent posits that the test for distinguishing merchandise inventory from supplies inventory is whether the applicable item has been separately charged to a patient.

Petitioners disagree with respondent's definition of merchandise. They assert that the hospitals do not acquire medical supplies for sale to patients, the transactions between hospitals and patients are not intended as sales, the transactions are not viewed as sales, and sales do not occur. Petitioners contend that the hospitals' patients obtain no right to select, control, transfer to others, dispose of, or otherwise exercise normal ownership rights over the supplies used in providing services to them. Petitioners argue that even such items as crutches or admission kits are provided by a hospital because of the particular treatment needs of the patient while in the hospital, and not as a means of selling those items to the patient.

In support of their respective positions, the parties presented the opinions of various experts.

Because we conclude below that petitioners' use of the hybrid method clearly reflects the income of the hospitals, we do not decide the question of whether the furnishing of medical supplies by petitioners' hospitals as a part of the rendering of

services to their patients could be considered to be a sale of merchandise which must be inventoried pursuant to section 1.471-1, Income Tax Regs.

Petitioners contend that even if its hospitals are required to use inventories under section 471, the use of an overall accrual method is not necessary to reflect income clearly. They maintain that under section 1.446-1(c)(1)(iv), Income Tax Regs.,[24] an accrual method is required only with regard to

---

[24]

Sec. 1.446-1(c)(1)(iv), Income Tax Regs., provides in pertinent part as follows:

Permissible methods.--(1) In general. Subject to the provisions of paragraphs (a) and (b) of this section, a taxpayer may compute his taxable income under any of the following methods of accounting:

* * * * * * *

(iv) Combinations of the foregoing methods. (a) In accordance with the following rules, any combination of the foregoing methods of accounting will be permitted in connection with a trade or business if such combination clearly reflects income and is consistently used. Where a combination of methods of accounting includes any special methods, such as those referred to in subdivision (iii) of this subparagraph, the taxpayer must comply with the requirements relating to such special methods. A taxpayer using an accrual method of accounting with respect to purchases and sales may use the cash method in computing all other items of income and expense. However, a taxpayer who uses the cash method of accounting in computing gross income from his trade or business shall use the cash method in computing expenses of such trade or business. Similarly, a taxpayer who uses an accrual method of accounting in computing business expenses shall use an accrual method in computing items affecting gross income from his trade or business.

(continued...)

purchases and sales and that the cash method is permitted for computing all other items of income and expense. They contend further that the hybrid method is expressly recognized and approved by respondent's regulations. Petitioners additionally contend that if the applicable hospitals were actually engaged in the sale of supplies, they would be entitled to use the installment method of reporting income, which would result in approximately the same or somewhat less income being reported than what was reported under the hybrid method as further modified.

Respondent contends, on the other hand, that petitioners may not use the hybrid method as further modified because only a unitary business is involved in the instant case. Petitioners counter that the hybrid method is an appropriate method even when a taxpayer's business is a single business rather than multiple businesses. We agree with petitioners' conclusion that the regulations do not restrict the use of a hybrid method to taxpayers engaged in more than one business. Cf. sec. 1.446-1(c)(1)(iv) through (d), Income Tax Regs.

Section 1.446-1(c)(1)(iv), Income Tax Regs., authorizes the use of a hybrid method such as the one used by petitioners in the

---

[24](...continued)

    (b)  A taxpayer using one method of accounting in computing items of income and deductions of his trade or business may compute other items of income and deductions not connected with his trade or business under a different method of accounting.  [Emphasis supplied.]

instant case.  The regulation provides:  "A taxpayer using an accrual method of accounting with respect to purchases and sales may use the cash method in computing all other items of income and expense."  Consequently, taxpayers are specifically allowed to use the accrual method for purchases and sales of inventory items and the cash method for the remaining items of income and expense.  The hybrid method formulated during the audit of petitioners' 1972-73 returns was designed to capture for accrual purposes income and expenses relating to the purchases and sales of inventory while permitting income and related expenses from all other sources to be computed on the cash method.  In three succeeding audits, respondent's agents used the hybrid method as modified or as further modified to incorporate additional income.

Respondent does not argue, nor do we find, that petitioners' hospitals impermissibly mixed the cash and accrual methods by, for example, reporting income on the cash method and related expenses on an accrual method, in contravention of section 1.446-1(c)(1)(iv), Income Tax Regs.  See supra note 25.  Petitioners' hospitals, moreover, utilize a sophisticated cost center accounting system under which it is quite feasible to accurately segregate accounts containing merchandise for which an accrual method is required from accounts which do not contain merchandise for which the cash method is appropriate.  Under such circumstances, we are persuaded that petitioners' hospitals utilized a hybrid method permitted under the regulations.

Respondent's acquiescence in petitioners' use of the hybrid method and the hybrid method as modified or as further modified over four consecutive audit cycles to compute taxable income of the applicable hospitals, while not binding on respondent, under the circumstances of the instant case is a factor in petitioners' favor.  See Klein Chocolate Co. v. Commissioner, 36 T.C. 142 (1961); Geometric Stamping Co. v. Commissioner, 26 T.C. 301 (1956); see also Public Service Co. v. Commissioner, 78 T.C. 445, 456 (1982).  Another favorable factor is the overwhelming acceptance of the cash method of accounting in the health care industry.  See Public Service Co. v. Commissioner, supra; Madison Gas & Electric Co. v. Commissioner, 72 T.C. 521, 556 (1979), affd. 633 F.2d 512 (7th Cir. 1980).  Additionally, petitioners' hospitals are in the health care industry, which is primarily a service industry.  See St. Luke's Hospital, Inc. v. Commissioner, 35 T.C. 236, 238 (1960); see also "Audits of Providers of Health Care Services", AICPA Audit and Accounting Guide (1992); Office of Management and Budget, Standard Industrial Classification Manual, 387-388 (1987).  Such industries historically have been permitted to use the cash method.

Respondent objects to petitioners' use of the hybrid method of accounting for the hospitals because of the disparity between the income reported under that method and the income that would have been reported had the hospitals employed an overall accrual

method of accounting.  That disparity results because a portion
of income is reported on the cash basis.

We have noted on other occasions that some distortion of
income is inherent in the cash method of accounting.  For
example, in Van Raden v. Commissioner, 71 T.C. 1083, 1104 (1979),
affd. 650 F.2d 1046 (9th Cir. 1981), we stated:

> The cash method of accounting will usually result
> in some distortion of income because the benefits
> derived from payments for expenses or materials extend
> to varying degrees into more than one annual accounting
> period.  If the cash method is consistently utilized
> and no attempt is made to unreasonably prepay expenses
> or purchase supplies in advance, the distortion is not
> material and over a period of years the distortions
> will tend to cancel out each other. * * *

We are satisfied from the record in the instant case that
the hospitals made no attempt to unreasonably prepay expenses or
purchase supplies in advance or to intentionally delay the
billing of receivables to defer collections to the next taxable
year.  There is no evidence that the hospitals' books are kept
inaccurately, unfairly, or dishonestly.

Section 1.446-1(a)(2), Income Tax Regs., expressly
recognizes that a uniform accounting method cannot be prescribed
for all taxpayers and that the appropriateness of any given
method will depend upon the taxpayer's needs.  RECO Indus. v.
Commissioner, 83 T.C. 912, 928 (1984).  The method of accounting
and the nature of a taxpayer's trade or business are
inextricable.  Accordingly, industry practice and trade custom,
although not dispositive, are factors to be considered in

determining whether a method of accounting clearly reflects income.  Public Service Co. v. Commissioner, supra at 455-457; Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 728 (1981); Magnon v. Commissioner, 73 T.C. 980, 1004-1006 (1980); Epic Metals Corp. & Subs. v. Commissioner, T.C. Memo. 1984-322, affd. without published opinion 770 F.2d 1069 (3d Cir. 1985). Consequently, any distortion of income must be examined in light of the business practice or business activities that give rise to the transaction which the Commissioner has determined must be accorded a different accounting treatment.  Van Raden v. Commissioner, supra.

In the instant case, the use of a hybrid method of accounting was specifically designed for petitioners' hospitals during the audit of petitioners' returns for the taxable years ended 1972 and 1973 to capture, for accrual purposes, income and expenses relating to the purchases and sales of many medical supplies while permitting income and related expenses from all other sources to be computed on the cash method.  As stated above, section 1.446-1(c)(iv)(a), Income Tax Regs., permits a taxpayer using the accrual method with respect to purchases and sales to use the cash method in computing all other items of income and expense, provided that the taxpayer's income is clearly reflected by the use of such method.  Accordingly, the

regulations under section 446 specifically authorize the use of the hybrid method.[25]  See also sec. 446(c)(4).

In RLC Indus. Co. v. Commissioner, 98 T.C. at 502-503, the taxpayer, a large timber user, combined timber in Oregon and California into a single block for purposes of computing its depletion under sections 611 and 631.  Even though the taxpayer's method was specifically authorized under the regulations, the Commissioner argued that the taxpayer's approach did not clearly reflect income.  We observed:

> In this case, petitioner complied with the regulations and was in conformity with accounting principles, industry practice, and other standards considered in this area.  Respondent argues that the method that she determined would more clearly reflect income.  Respondent's focus is upon the disparity between the method she determined and the one used by petitioner.  That focus, in the setting of this case, is an insufficient reason for the imposition of a differing method determined by respondent.  The best method is not necessarily the one which produces the most tax in a particular year.  If, as here, a taxpayer's method is consistently applied and clearly

---

[25]

In Sullivan v. Commissioner, T.C. Memo. 1963-264, the taxpayer, a subcontractor to general contractors on building construction jobs who also did some manufacturing of component parts, changed his method of accounting from the cash method to a modified accrual method whereby he accounted for purchases and sales on the accrual method and all other items of income and expense on the cash method.  We noted that the Commissioner's regulations explicitly sanction such a hybrid method.  Under such circumstances, we held that the taxpayer could not accrue as a legal and auditing expense an auditing fee incurred during the tax year for reconstructing his accounting records and paid during a later tax year, but that the taxpayer would have to account for and deduct such auditing expense on the cash method; i.e., the method he used for all his expenses other than purchases.

reflects income, we will not sustain respondent's determination merely because it produces more income tax for the taxable year under consideration. * * * Disparity in amount is not, per se, necessarily indicative of a failure to clearly reflect income. * * * [Id.; fn. ref. omitted.]

In the instant case, the record as a whole suggests that a substantial portion of the disparity between income reported on the accrual method and income reported on the hybrid method results from respondent's proposed accrual of revenue related to room charges and ancillary services. Such ancillary services would include the use of special facilities such as the operating room, the recovery room, and the delivery room, as well as laboratory tests, x-rays, physical therapy, and group and individual therapy for psychiatric patients. Because such income results from the provision of services, it historically has been reported on the cash method.

We also are persuaded by the statement of Mr. Duis, one of petitioners' experts, that the increase in accounts receivable reflected on petitioners' returns for the years in issue primarily resulted from the rapid increase in the number of hospitals that formed HCA over those years and not from a change in business practice. Consequently, we do not find that the disparity in income reported under the hybrid method from that which would have been reported under an accrual method sufficient reason in the instant case for requiring the hospitals to adopt an overall accrual method of accounting.

We are persuaded that petitioners' use of the hybrid method was particularly appropriate in view of the hospitals' operations.

Respondent contends, however, that the hospitals' hybrid method as modified and as further modified does not clearly reflect income because it does not result in income substantially identical to the income which would be reported under an overall accrual method. Respondent contends that the substantial-identity-of-results test focuses on whether there are substantial accounts receivable. According to respondent, petitioners do not pass the substantial-identity-of-results test because the hospitals have title to a substantial amount of inventory and have a substantial amount of accounts receivable.

The courts have applied a substantial-identity-of-results test for determining whether there was an abuse of respondent's discretion in not permitting a taxpayer with inventories to continue to use the cash method of accounting under section 1.446-1(c)(2)(ii), Income Tax Regs. See Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. at 377; see also Ralston Dev. Corp. v. United States, 937 F.2d 510, 514 (10th Cir. 1991); American Fletcher Corp. v. United States, 832 F.2d at 440; Asphalt Prods. Co. v. Commissioner, 796 F.2d 843 (6th Cir. 1986), affg. in part and revg. in part Akers v. Commissioner, T.C. Memo. 1984-208, revd. per curiam on another issue 482 U.S. 117 (1987); Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d at 356; J.P. Sheahan

Associates v. Commissioner, T.C. Memo. 1992-239; Surtronics, Inc. v. Commissioner, T.C. Memo. 1985-277.

The substantial-identity-of-results test was first articulated in Wilkinson-Beane, Inc. v. Commissioner, supra. The taxpayer had argued that the disparity in gross income under the cash method and an accrual method was inconsequential. The Court of Appeals disagreed, stating:

> The standard we apply is whether the taxpayer's method of accounting reflects his income with as much accuracy as standard methods of accounting permit. In our view, this means that the taxpayer must demonstrate substantial identity of results between his method and the method selected by the Commissioner. * * * [Id. at 356; fn. ref. omitted.]

We recently had occasion to address the substantial-identity-of-results test in Ansley-Sheppard-Burgess Co. v. Commissioner, supra. In that case, the Commissioner argued, inter alia, that in order to show an abuse of discretion by the Commissioner a taxpayer using the cash method to report income must, in all instances, be able to show a substantial identity of results between the cash method and the method of accounting which the Commissioner determines clearly reflects the taxpayer's income. We disagreed, stating:

> Respondent's contention that we must apply the substantial-identity-of-results test in cases where the taxpayer is not required to maintain an inventory is without support in the case law. * * * [Id. at 377.]

The Court of Appeals for the Sixth Circuit, to which the instant case would be appealable absent stipulation to the

contrary, applied the substantial-identity-of-results test in

Asphalt Prods. Co. v. Commissioner, supra.  The taxpayer, which

produced and sold emulsified asphalt, had employed the cash

method of accounting from its inception.  Through 1973, the

taxpayer had only nominal inventories on hand at yearend because

it normally closed down its operations for several weeks before

the end of the year.  The taxpayer's principal customers were

county governments in Tennessee that used emulsified asphalt for

road construction and maintenance.  The county governments

received revenues required for that purpose from their share of

State gasoline taxes.  As an effect of the Arab oil embargo of

1973, the price of emulsified asphalt rose rapidly while the

consumption of gasoline dropped sharply.  Consequently, the

taxpayer's accounts receivable increased substantially between

January 1, 1974, and January 1, 1975.  Additionally, because

suppliers of the petroleum residue that was the principal

ingredient of emulsified asphalt required their customers to

accept their allocations of the petroleum residue on a monthly

basis, the taxpayer had inventories on hand at the end of 1974

and 1975.  On audit, the Commissioner determined that the

taxpayer had to use the accrual method of accounting because the

use of inventories was necessary to clearly reflect income due to

the fact that the production and sale of merchandise was an

income-producing factor.  The Commissioner determined

additionally that the fluctuations in accounts receivable

resulted in a mismatching of receipts from sales and cost of sales and therefore the cash method was not appropriate.  The Court of Appeals for the Sixth Circuit agreed that the change of accounting method by the Commissioner was not an abuse of discretion under the circumstances in that "Though the temporary increase in inventory in the present case was not significant, the large increase in accounts receivable created a situation where only use of the accrual method of accounting would avoid a serious distortion."  Asphalt Prods. Co. v. Commissioner, supra at 848-849.

Relying on Wilkinson-Beane, Inc. v. Commissioner, supra, the Court of Appeals for the Sixth Circuit concluded that "Where the Commissioner has determined that the accounting method used by a taxpayer does not clearly reflect income, in order to prevail, 'the taxpayer must demonstrate substantial identity of results between his method and the method selected by the Commissioner.'" Id. at 849.  In that case, the taxpayer reported income from the sale of merchandise on the cash method of accounting.  In the instant case, the hospitals used a hybrid method, not a cash method of accounting.  In Wilkinson-Beane, Inc. v. Commissioner, T.C. Memo. 1969-79, we specifically cautioned that "It must be remembered that our analysis of the above regulations and cases is in the context of the cash or accrual bases of accounting.  We are not faced with a hybrid method."

The substantial-identity-of-results test is not applicable under the circumstances present in the instant case.  As we read Asphalt Products, it is clear that the focus of the Court of Appeals for the Sixth Circuit was on the mismatching of the taxpayer's receipts from the sale of products with its cost of goods sold.  See, e.g., 796 F.2d at 847.  Indeed, that court stated:

> If the temporary and rather insignificant increase in inventories of raw materials had been the only basis for the Commissioner's determination, we would have been inclined to find an abuse of discretion.  We do not construe the Code provisions and regulations relating to inventories in the absolute terms adopted by the Commissioner and the Tax Court.  However, the taxpayer's method of accounting did not produce an accurate picture of its 1974 income.  The income tax is structured on an annual basis.  Using the cash method, the cost of materials sold in 1974 was deducted on the 1974 return, yet the proceeds from that portion of the same sales represented by the accounts receivable were not included in the taxpayer's gross receipts as reported on its return.  Unlike the inventory item, the accounts receivable were not negligible before 1974 and did not shrink even to their former size at the end of the oil emergency.  The taxpayer had accounts receivable of $238,000 at the end of 1976.  These facts supported the Commissioner's determination that the cash receipts and disbursements method did not clearly reflect the taxpayer's income.  [Id. at 849.]

In the instant case, petitioners report patient receivables and related expenses attributable to the Pharmacy and Central Supply accounts on the accrual method.  Consequently, the presence of the substantial accounts receivable at yearend does not mean "that the cost of goods sold had been deducted while the

proceeds from the sales of these goods had not been included in income." Id. at 848.

In light of all the facts and circumstances, we conclude that application of the substantial-identity-of-results test is unwarranted in the instant case. We have held above that the hybrid method is a permissible method under the regulations and that it clearly reflects the taxable income of the hospitals.

We have considered other arguments raised by respondent but find them unpersuasive. In view of our holding, we do not address petitioners' contention that the legislative history of section 801 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2345 (adding section 448 to the Code, which requires certain corporations, including hospitals, to change prospectively beginning in 1987 to an overall accrual method), demonstrates that Congress recognized that under prior law hospitals could use the cash method or a hybrid method of accounting. Also, we do not address petitioners' contention that they would be entitled to report on the installment method if the hybrid method were found not to clearly reflect their income. Additionally, we do not decide respondent's contention that the hospitals sold merchandise. Finally, as stated above, we do not decide the issue of whether respondent changed the hospitals' method of accounting during an earlier audit.

One final word. The instant case contains a voluminous record and involves numerous factual issues to be decided by this

Court.  The issue we have decided in this opinion is only the first of such issues, albeit the one involving a substantial portion of the deficiencies in controversy.  As inherently factual as these issues are, we think it is appropriate at this juncture to remind the parties of our previous admonitions concerning settlement of the instant case.  Consequently, we direct the parties to make another good faith effort to settle the remaining issues.

To reflect the foregoing,

<u>Appropriate orders</u>

<u>will be issued.</u>